Louis SCOTT, Appellant,

v.

The STATE of Texas, Appellee.

No. 52137.

Court of Criminal Appeals of Texas.

Oct. 20, 1976.

Dissenting Opinion On State's Motion For Rehearing April 13, 1977.

Barry P. Helft, Dallas, for appellant.

Henry Wade, Dist. Atty., Ronald D. Hinds, David C. Schick and Stewart C. Robinson, Jr., Asst. Dist. Attys., Dallas, Jim D. Vollers, State's Atty. and David S. McAngus, Asst. State's Atty., Austin, for the State.

OPINION

BROWN, Commissioner.

This is an appeal from a conviction for burglary. Appellant was tried before a jury which found him guilty and assessed punishment at five (5) years in the Texas Department of Corrections.

The sufficiency of the evidence to support the conviction is not challenged. Appellant's sole ground of error is that the trial court erred in overruling appellant's motion to suppress evidence seized from the automobile in which appellant was a passenger, because the search was illegal.

The State's only witness at the motion to suppress hearing was the arresting officer, J. S. Williamson. Williamson testified that he was a member of the Tactical Division of the City of Garland Police Department. He stated that he was on patrol, in plain clothes and driving an unmarked car, during the early morning hours of February 25, 1975, which was a Tuesday. He defined his patrol area at that time as the Towngate area, which consisted of fashionable new townhouses and a large apartment complex known as Eastgate located across the major thoroughfare servicing the area. Williamson characterized the area as a "high crime area" and stated that he was assigned to "burglary patrol" in that area based on a computer analysis of the likelihood of crime to be committed in that area during that particular time. He stated that there had

been reports of hubcap thefts in the East-gate complex at a time prior to this particular occasion, but the precise time was not determined. He stated that at about 1:30 a. m. he saw a car coming from the direction of some of the newer townhouses on a street where only a few of the homes were occupied and some model townhouses were located. Williamson said that he pulled his car to the curb to observe the other car because "I [had] been down that area for several months, and during this time, at this time of night, there is no cars on that street . . . the people that live in that area . . . have the rear end garages . . . they pull in the alley and they go in homes . . . there is never any activity out there at night . . . ." He stated that there were no street lights in the area and that it was totally dark. The other car passed within a few feet of Officer Williamson's vehicle and he stated that he could determine that it was a "white over blue '74 Cadillac" containing two black males in the front seat and what appeared to be "sheets of material" about five feet square propped up in the back seat.

Williamson stated that he turned his patrol car around and followed the Cadillac for approximately two blocks before turning on his red lights to stop it. He said that he reported to the radio dispatcher that he was "out on traffic" and requested a back-up squad. He stated that he had observed no traffic violations and that the Cadillac had proceeded at an average speed. He testified that he stopped the car "purely to investigate due to the circumstances . . . under which (he) had seen it . . . around the townhouses." He stated that he asked the occupants of the car for their identification and the driver, a Mr. Smith, produced an identification card (it was not stated whether this card was a driver's license). Appellant was sitting in the passenger seat of the car and produced no identification, but told Williamson his name and birth date. Williamson stated that as he approached the Cadillac to request identification, he passed the rear window of the car and determined that the "sheets of ma-terial" were oil paintings. He asked Smith and appellant what they were doing in the area and where they got the paintings and they responded that they had exited the nearby LBJ Freeway and had become lost on their way to decorate a friend's apartment. A second officer arrived on the scene and Williamson sent him back to the townhouses to see if there were any signs of burglary. While the second officer was gone, Williamson radioed the dispatcher to check the identification of Smith and appellant (the record does not show the result of this radio check). The other officer then called Williamson over the radio to advise that it appeared that at least one of the townhouses had been burglarized and that there were bare spaces on the walls where pictures had been hanging.

Throughout the duration of this investigation (approximately twenty to thirty minutes) appellant and Smith alternately sat in their vehicle and paced up and down the road and expressed their dissatisfaction to Williamson at being detained. After receiving word from the other officer that the townhouse had been burglarized, Williamson placed appellant and Smith under arrest and put them in his patrol car. He then retrieved the keys to the Cadillac and opened the trunk where he discovered other decorative items apparently stolen from the townhouse.

 The legality of the search of the Cadillac and the seizure of the items depends on the justification for the initial stop of the car. The constitutional validity of such an investigative stop depends on "specific and articulable facts and circumstances" and the officer's reasonable inferences from those facts in each individual case. *United States v. Brignoni-Ponce*, 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975); *Sibron v. New York*, 392 U.S. 40, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1967); *Brown v. State*, 481 S.W.2d 106 (Tex.Cr.App.1972). It is axiomatic that the investigative stop and the subsequent search cannot be justified by what is discovered. *Sibron, supra; Brown, supra.*

We compare the facts and circumstances in *Brown,* supra, with the instant case. In *Brown,* the Dallas police officer was on routine patrol in the downtown area of that city in an unmarked patrol car. At about 1:30 a.m. he saw a green Volvo bearing out-of-state license plates about one half block ahead of him on a poorly lighted, sparsely traveled street. He stated that his attention was attracted to the car because there were clothing and a box of crackers on the ledge between the back seat and rear window. He stated that he could see that the car contained four men, three of whom "fit the general description" of persons who had committed an armed robbery at a Dallas supermarket on the previous day. That general description consisted only of race and approximate height and weight. He stated that he observed the two men in the back seat turn around and look toward him and then move their shoulders. He concluded they were concealing firearms in the back seat. The car was subsequently stopped and searched and various items of contraband were found.

We determined that the officer's justification for stopping the car was based on two facts, (1) his conclusion that they fit the general description of the armed robbers, and (2) his conclusion that the two men in the back seat were concealing weapons. We held his conclusions insufficient to justify the stop and search on the basis that the general description of height, weight and race would serve, at most, only to raise a mere suspicion that the men were the robbers and such an inarticulate hunch or suspicion of the officer is insufficient to constitute probable cause. *Sibron, supra.* We further held that such suspicion could not be transformed into probable cause by the movement of the two men in the back seat. This movement was not the type of "furtive gesture" which would indicate criminal activity, but was more in the nature of "ambiguous conduct which the arresting officers themselves have provoked." *Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).

*Talbert v. State,* 489 S.W.2d 309 (Tex.Cr. App.1973) also involved a similar set of circumstances. There the Austin police officer was on patrol near the University of Texas campus which he characterized as a "high crime area." He observed the taillights of a car parked at a curb and saw a man enter the car. The car then slowly drove away and the officer followed for several blocks before stopping it "to make sure everything was in order." The officer stated that he had observed no possible traffic violations. During this investigative stop, the officer observed a paper sack on the front seat and a plastic baggie sticking out of the paper bag. He stated he could discern a green, grass-like substance, later proven to be marihuana, inside the plastic bag. Appellants were subsequently arrested and the contents of the bag introduced as evidence. Citing *Brown,* supra, we held that the officer had no probable cause to stop appellant's automobile.

In examining the officer's testimony in the present case, we note that, as in *Brown, supra,* and *Talbert, supra,* he saw no traffic violation which would justify the initial stop. *Hampton v. State,* 511 S.W.2d 1 (Tex. Cr.App.1974); *Borner v. State,* 521 S.W.2d 852 (Tex.Cr.App.1975). We note also that the officer had received no police dispatch about a suspected automobile or person which might likewise have justified the initial stop. *Washington v. State,* 518 S.W.2d 240 (Tex.Cr.App.1975). Compare *Colston v. State,* 511 S.W.2d 10 (Tex.Cr.App.1974).

■ Therefore, the justification for Officer Williamson's initial stop must rest on the specific and articulable facts and circumstances which he observed and from which he drew his inferences. Those facts and circumstances consist of (1) his awareness that there were reports of hubcap thefts in the nearby apartment complex; (2) his characterization of the Towngate area as a "high crime area"; (3) his observation of two black males driving a white and blue 1974 Cadillac on a dark, sparsely traveled street at 1:30 a. m.;[1] and (4) his

1. Appellant called the project superintendent of the Towngate development as a witness at the

motion to suppress hearing. He stated that some of the townhouses were owned by young-

observation of the "sheeting material" in the back seat of the car.

We find the facts insufficient to justify the initial stop and it was, therefore, error to overrule appellant's motion to suppress the evidence seized from the car.

The judgment is reversed and the cause remanded.

Opinion approved by the Court.

DOUGLAS, Judge (dissenting).

The majority reverses the conviction on the ground that the evidence used against appellant was obtained as the result of an illegal search.

Testimony concerning the arrest and search was given by J. S. Williamson, a member of the Tactical Division of the Garland Police Department with six years' experience. Officer Williamson was on patrol during the early morning hours of February 25, 1975. He was assigned to a high crime area in Garland known as Towngate. The high crime classification was based on a computer analysis of the probability of criminal activity occurring in that area during that particular time. Towngate was characterized as a complex of expensive townhouses.

Officer Williamson stated that there had been reports of hubcap thefts in the nearby Eastgate apartment complex earlier that evening. He stated that at approximately 1:30 a. m. he saw an automobile coming from an area where only a few of the homes were occupied and where some model townhouses were located. He had worked in that area for several months and knew that it was usually devoid of early morning activity. There were no cars on the street because the homeowners had rear-end garages which were entered through an alley. There were no street lights in the area from which the other car had come.

As a result of the conditions when then obtained, Officer Williamson pulled his car to the curb to observe the other vehicle. He determined that it was a white-over-blue 1974 Cadillac occupied by two males and that it contained four or five sheets of material propped up in the backseat. Lighting from the freeway opposite the Towngate area enabled Williamson to make these observations as the Cadillac passed within a few feet of his vehicle. The officer turned his car around and followed the Cadillac for approximately two blocks before stopping it. He stated that he had observed no traffic violations and that the Cadillac had proceeded at an average speed. He further stated that his investigatory stop was based solely upon the circumstances under which he had observed the car.

Williamson asked both occupants for their identification. The driver, Smith, produced an identification card. Appellant, without identification, told the officer his name and birthdate. As Williamson approached the Cadillac to request identification, he passed the rear window of the car and determined that the "sheets of material" were oil paintings. They were in plain view. Williamson found the paintings to be similar to those he had observed in the townhouses. In response to Williamson's questioning, Smith and appellant said that they had become lost while on their way to decorate a friend's apartment with the paintings.

Officer Williamson returned to his car and called the radio dispatcher. Williamson asked the dispatcher to run a computer check for warrants on both Smith and appellant. At this point, Officer Aldridge arrived. Williamson directed him to return to the southwest section of the Towngate area to check the homes for signs of burglary. Approximately twenty minutes later, Aldridge called Williamson to advise him that at least one of the townhouses had been burglarized and that there were bare spaces

er couples and that it was not unusual for them to entertain guests until late in the evening. He also stated that he had heard nothing about any crimes being committed in the develop- ment prior to this burglary, which tends to rebut the testimony that the area was a "high crime area."

on the walls where pictures had been hanging. Williamson then placed Smith and appellant under arrest. A subsequent search of the Cadillac's trunk revealed other stolen items.

The legality of the search of the Cadillac and the seizure of the items therein turns on the justification for the initial stop of the automobile. Circumstances which are insufficient to establish probable cause for arrest may justify temporary detention for purposes of investigation since an investigation involves a lesser intrusion upon the personal security of an individual than does an arrest. *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); *Ablon v. State*, 537 S.W.2d 267 (Tex.Cr.App.1976). Such purposes may include determination of the identity of a suspicious individual or momentary preservation of the status quo in order to obtain more information. *Adams v. Williams*, 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972); *Wood v. State*, 515 S.W.2d 300 (Tex.Cr.App.1974). In this connection an occupant of an automobile is just as subject to a brief detention as is a pedestrian. *Adams v. Williams, supra; Wood v. State, supra.* The officer must have specific and articulable facts which, in light of his experience and general knowledge, reasonably warrant such a stop. *Terry v. Ohio, supra; United States v. Brignoni-Ponce*, 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975); *Baity v. State*, 455 S.W.2d 305 (Tex.Cr.App.1970), cert. denied 400 U.S. 918, 91 S.Ct. 180, 27 L.Ed.2d 158.

The case at bar is factually similar to *Thompson v. State*, 533 S.W.2d 825 (Tex.Cr.App.1976). In *Thompson*, two men were walking along a Port Arthur street at 1:00 a. m. This was a high crime area where prowlers had been recently active. Defendant was carrying what appeared to the officers as a woman's type suitcase. The officers stopped the two men and requested some identification. Defendant told one officer that he had been convicted for burglary after that officer recognized his name.

The officers observed that defendant was carrying a blue suitcase with one metal tag reading "Western Electric Company" and a second tag bearing the name of a Beaumont woman. Defendant told them that he had found the suitcase in Baytown. He gave the officers conflicting accounts of his home address and said he did not know where he was going.

At that point the officers arrested the two suspects and took them to the police station. A subsequent search of the suitcase revealed two desk telephones. Later that morning a burglary was discovered at an elementary school in Port Arthur. A blue suitcase containing two demonstration telephones belonging to Southwestern Bell was reported stolen. The burglary took place a few blocks from where defendant and the other suspect were arrested. We held that the location and time of defendant's detention by the police, coupled with the fact that the suitcase was evidently owned by someone other than defendant, and his inability to explain satisfactorily his possession of the suitcase were enough to warrant the arrest of defendant under Article 14.03, V.A.C.C.P.

In the instant case, the combination of the location, time, reports of recent criminal activity and the protruding sheets in the Cadillac was sufficient, in light of Officer Williamson's experience and general knowledge, to permit him to stop and detain the automobile. The officer's subsequent observation of the paintings, in conjunction with Officer Aldridge's report that paintings had been recently stolen from a nearby home and the occupants' inability to satisfactorily explain their possession of the paintings, provided Williamson with probable cause to arrest the two men pursuant to Article 14.03, supra. See *Hernandez v. State*, 523 S.W.2d 410 (Tex.Cr.App.1975).

Appellant relies upon *Talbert v. State*, 489 S.W.2d 309 (Tex.Cr.App.1973). *Talbert* is distinguishable on its facts. There, defendant was stopped because he was driving his automobile near the University of Texas campus at 1:30 a. m. and the Austin policeman who spotted him wanted "to make sure everything was in order." During this investigative stop marihuana was discovered on the front seat. We held that

the officer had no probable cause to stop the automobile. Our holding turned on the inaccurate characterization of the arrest location as a high crime area. The record reflected that the officer's high crime determination was based upon personal experience, not upon objective analysis. His definition of high crime area included collisions and violations of the uniform traffic act. The record also reflected that he held the opinion that the entire University area was a high crime area. We determined that blanket-labeling such a substantial portion of Austin as a high crime area could not justify the stopping of defendant's automobile.

No error is shown; the judgment should be affirmed.

GUPTON, J., joins in this dissent.

## DISSENTING OPINION ON STATE'S MOTION FOR REHEARING

The majority denies leave to file the State's Motion for Rehearing. The State's brief in support of the motion, prepared by Ron Hinds, Assistant District Attorney for Dallas County, is adopted in part as a dissent in the failure to grant such motion. With page numbers omitted, it is as follows:

". . . The police officer had made an investigatory stop under *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), and, upon seeing plain view evidence in the back seat of the automobile, further detained the two subjects for a brief period of time until a rapid investigation for criminal activity in the area could be completed by another police officer. It was only after the completion, with affirmative results, of this additional investigation, that Officer Williamson placed the two subjects under arrest and made a search of the vehicle. An outline of all facts and circumstances bearing upon the officer's decision to make the initial stop of the vehicle would read as follows:

"(A) A computer is used by the Garland Police Department to evaluate crime rate statistics according to particular areas, particular nights, and particular times of night, in order to pinpoint probable criminal activity and assign a special six man tactical unit to these areas. . . .

"(B) In order to effectively combat this anticipated activity, the police units were in plain clothes and unmarked cars, and were to be specifically on the look-out for burglaries and various forms of theft.

. . . . .

"(C) Officer Williamson had worked in that area off and on for five years, first as a patrol officer and later as a tactical officer. . . .

"(D) As a tactical officer he had worked among these townhomes for a period of several months prior to this occurrence.

. . .

"(E) Officer Williamson first saw the subject's vehicle at about 1:00 a. m. . . The vehicle was first seen on a street in a new section of the townhomes which is without street lights and is 'totally dark'.

. . .

"(F) The officer's experience was that at that time of night there were normally no cars out on that particular street and in fact, 'there is never any activity out there at night.' . . .

"(G) Further, only six or seven families were living on that particular street at that time and all had rear entry garages and, normally, never used that particular street at night. . . .

"(H) If anyone was encountered there at that particular time of night, 'they are either going to be thieves, lovers or police.' . . .

"(I) At the time the subject's vehicle was first observed, there were no other cars in this residential area nor were there any people on the streets. . . .

"(J) As the vehicle passed his parked police car, he observed two black males in a vehicle he did not recognize as belonging in the area. . . .

"(K) He further observed four or five sheets of material, some two or three inches thick, which may have been building material, sticking up in the back seat of the automobile. . . .

It is finally observed that the police officer indicated he would have stopped the vehicle regardless of whether the occupants were white or black. . . .

"It is again emphasized that at this point no arrest nor search had been made. The subjects had simply been pulled over for an investigatory stop. When Officer Williamson approached the vehicle to request driver's license identification, he observed that the sheeting material was actually a collection of several large oil paintings. . . . This information in combination with the foregoing facts and circumstances were sufficient to acceptably raise the officer's suspicions to the point of requesting a rapid investigation of the townhomes, along the street from which the subject vehicle had appeared, by a fellow officer. . . . At this point, Appellant and the other occupant of the vehicle were still not under arrest nor had they been searched. They were simply being momentarily detained while the second officer checked out the townhomes. Approximately fifteen to twenty minutes passed and Officer Williamson received radio communication from the second officer that he had indeed found forced entry into one of the townhomes and that, further, paintings similar to those in the subject vehicle were missing from the townhome. . . . Only now did Officer Williamson, with this new and further information, arrest the subjects and search their vehicle. . . .

"A review of several similar cases is instructive in evaluating the quality of the above described activity:

"(A) In Moses v. State ([Tex.Cr.App.] 1971) 464 S.W.2d 116 (no dissent), the provisions of Article 14.03, C.C.P., were invoked in an opinion by Judge Odom to control a situation wherein a police officer patrolling a business-residential area saw a panel truck 'coming from behind some buildings without its lights on.' Because it was about 3:40 a. m., the officer stopped the vehicle for a brief investigation and, upon approaching it, he saw in plain view various burglary tools. The officer then felt he had sufficient proba-

ble cause to arrest Appellant and search him, finding the fruits of a burglary. "(B) Judge Douglas, in writing for the Court in Thompson v. State (1976) 533 S.W.2d 825 (no dissent), dealt with a case in which officers observed two individuals in 'a high crime area where many prowlers had been recently reported. Appellant was carrying what appeared to the officers as a woman's type suitcase.' This was deemed sufficient probable cause to justify a momentary stop and request for identification. Once stopped, Appellant provided suspicious and inconsistent name and address information and the officers observed in plain view suspicious suitcase tag information. This justified the ultimate arrest and search of the pair.

"(C) In an opinion by Judge Roberts, Castillo v. State ([Tex.Cr.App.] 1973) 494 S.W.2d 844 (no dissent), it was shown that while patrolling an alley at approximately 12:35 a. m., police officers 'observed an automobile parked near the alley. There had been several burglaries in the area recently. Two men were seen exiting the alley, walking at a rapid pace toward the parked vehicle. That car drove off and the officers followed. They soon stopped the car and sought identification.' Once this investigatory stop had been made, the police officers received inconsistent information from the two and observed that the appearance of the suspects was consistent with criminal activity. This provided justification to detain them until a second police unit could be 'dispatched back to the alley and the officers discovered a side of beef, still cold, an adding machine and a calculator, all on one side of the alley. The back door to a meat company had been forced open.' At this point, 'Appellant and his companion were arrested.'

"(D) In Baity v. State ([Tex.Cr.App.] 1970) 455 S.W.2d 305 (no dissent), Judge Onion discussed a situation involving a police officer with much experience 'patrolling in the down town business area on a routine building check.' The officer 'observed a man enter the alley . . .

then suddenly turn back out of the alley.' It being 4:56 a. m., the officer 'sped up his vehicle and observed the man on Eighth Street "walking fast with his coat pulled up tight . . . walking real fast." ' The officer recognized the person as one with a record of arrests for theft and burglary and at this point made an investigatory stop. When the Appellant turned in response to the officer's call, the officer then observed in plain view a burglary tool and some other object, which proved to be a coin box. The officer then detained Appellant until he could determine that a nearby cafeteria had been burglarized. At this point Appellant was arrested.

"(E) In an opinion by Judge Dally, *Hernandez v. State* ([Tex.Cr.App.] 1975) 523 S.W.2d 410 (no dissent), it was noted that at 3:00 p. m., two officers on patrol 'saw an automobile parked in front of a motel; in the open trunk he saw a piece of furniture partly wrapped with a blanket.' One of the officers further recognized Appellant and his companion as having prior arrests, made a U–turn and started back toward the motel. As they followed the vehicle, the officer noted that the furniture seen earlier was a console television set. They made an investigatory stop of the vehicle, and only then did the officer observe 'in plain view on the rear floor board an adding machine that looked like the adding machine that he knew had been stolen from a lawyer's office in a recent burglary.' The suspects were then placed under arrest.

"(F) In another opinion by Judge Dally, *Onofre v. State* ([Tex.Cr.App.] 1972) 474 S.W.2d 699 (no dissent), an officer, saying that 'he was "suspicious of any car behind a business at nighttime; at 2:00 a. m. in the morning" ', observed two men in a parked car at 2:30 a. m. behind a bar. As he approached, he saw Appellant 'dump something under the seat or appear to dump something under the seat.' Ordering the two to stop, he approached the car and observed in plain view cigarette papers and marijuana. He then searched

the vehicle, finding more marijuana, and arrested the suspects.

"(G) Judge Jackson, writing for the Court in *Anderson v. State* ([Tex.Cr.App.] 1974) 504 S.W.2d 507 (no dissent), discussed facts indicating that 'Appellant was found attempting to enter a parked automobile on the University campus.' His suspicions aroused, a security officer requested identification. When this request was refused, Appellant was arrested and searched with the ultimate disclosure of a prohibited weapon.

"(H) In *Denham v. State* ([Tex.Cr.App.] 1968) 428 S.W.2d 814 (no dissent), another opinion by Judge Onion, 'at approximately 2:00 a. m. . . . Officer Pappas had his suspicions aroused when he observed the Appellant near a coin operated news stand rack.' When the officer approached to investigate, Appellant got into a nearby vehicle and 'immediately drove off.' 'Pappas followed and having determined that Corbin was speeding and having called for assistance, stopped the vehicle in which Appellant was a passenger.' On approach of the vehicle, the officer observed in plain view various burglary tools. Placing emphasis upon 'Appellant's actions at or near the coin operated news stand and his immediate departure upon the approach of the officer,' the opinion found sufficient circumstances to justify the officer's suspicions.

"(I) In a somewhat older case, *Ringo v. State* (1955) [161 Tex.Cr.R. 93] 275 S.W.2d 121 (no dissent), police officers were patrolling an area with a bad reputation at 1:30 a. m. when they 'observed an automobile with the lights off, on the wrong side of the street, pulling away from or circling a restaurant and beer joint.' The officers then followed the car and made an investigatory stop. The occupants of the vehicle were unable to produce identification and gave inconsistent information concerning registration of the automobile. They were arrested and searched.

"It should also be noted that footnote 1 of the Court's opinion in this case is factually

incorrect. The project superintendent spoken of, and called as a defense witness, testified in answer to a question concerning parties, late hours, and the entertainment of· guests in the neighborhood, that 'I'm sorry, I can't answer that. I generally leave there in the afternoon and I don't know what happens.' . . . He further stated in response to a question concerning how frequently the residents used the streets, that 'that's a hard question . . I don't know.' . . . His testimony concerning awareness of whether this was a high crime area consisted simply of 'I don't recall. I don't believe—I was not notified by the police department.' . . .

"Of course, the whole question of whether his testimony tends or does not tend to rebut that of the police officer is one to be decided by the fact-finder. Acting in this role, the trial court judge evaluated the evidence and concluded that the officer did everything he could to protect the rights of the subject consistent with protecting the rights of the general public, and consequently, the evidence was admissible and Appellant's motion was overruled. This placed the burden on Appellant to show this court that these facts, taken in the light most favorable to the State, were not sufficient to support the judge's findings. A careful evaluation of the above outlined facts in combination with the summarized cases can lead to no other conclusion than that Appellant has not satisfied his burden."

It appears that Officer Williamson should be commended for good police work and the case should not be reversed. The motion for rehearing should be granted and the judgment should be affirmed.

ONION, P. J., joins in this dissent.