# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

NO. 03-11-00246-CR
NO. 03-11-00252-CR

**Tekel Foote, Appellant**

**v.**

**The State of Texas, Appellee**

FROM THE DISTRICT COURT OF TRAVIS COUNTY, 299TH JUDICIAL DISTRICT
NOS. D-1-DC-10-205939 & D-1-DC-10-205938
HONORABLE KAREN SAGE, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

Tekel Foote was charged with unlawful possession of a firearm by a felon and aggravated robbery with a deadly weapon. During a pre-trial hearing, Foote filed a motion to suppress arguing that all of the evidence obtained after his detention should be suppressed because his detention was not supported by reasonable suspicion. Ultimately, the district court denied the motion, and Foote entered into a plea agreement under which he was entitled to appeal the district court's ruling on the motion to suppress. We will affirm the district court's judgments.

## BACKGROUND

One night in October 2010, members of the Austin Police Department's metro tactical unit were patrolling an area of East Austin that is near the downtown entertainment district. That area had recently experienced an increase in the number of robberies and burglaries, and the

tactical unit was attempting to catch the perpetrators by patrolling the area in both unmarked and marked police vehicles. The unit was informed that two to three African American men had been committing robberies in that area and that they wore dark clothing and bandannas.

Around 12:45 a.m., Police Sergeant James Dixon was driving in an unmarked police car and saw two African American men standing by a parked car. Shortly thereafter, Sergeant Dixon noticed Foote, who is also African American, exiting a nearby vehicle wearing a glove and carrying a bandanna in his hand. All three men were wearing dark clothing. Next, Sergeant Dixon saw Foote open the passenger door of his car and either take something from under the front seat or put something underneath the seat.

Sergeant Dixon felt that he should investigate the situation further and called for backup. In response to his call, two patrol cars arrived on the scene, and the officers exited their vehicles. At some point, Foote turned and walked away from the uniformed officers. One of the uniformed officers asked Foote to stop, but Foote began to run instead. Officer Paul Chavez ran after Foote and observed Foote remove an item from his waistband that looked like a gun and throw the object over a railing. Ultimately, Officer Chavez caught up to Foote, and a handgun was found in the area where Officer Chavez saw Foote throw the item that the officer "thought was a gun."

After the police detained Foote, they searched his car and found two laptops and a cellphone in the backseat. Those items were later linked to an aggravated robbery.

Eventually, Foote was arrested and was indicted for possession of a firearm by a felon and for aggravated robbery with a deadly weapon. After being charged, Foote filed a motion to suppress the evidence seized by the police. In his motion, Foote contended that the police did not

have reasonable suspicion to stop him and that the subsequent search by the police was therefore illegal. In response to the motion, the district court scheduled a hearing. After hearing arguments from both sides, the district court denied Foote's motion to suppress at the end of the hearing.

Subsequent to the district court's ruling, Foote entered into a plea bargain and pleaded guilty to the two charged offenses. Under the terms of the plea, Foote was allowed to appeal the district court's ruling on his motion to suppress. After the district court accepted the plea, it sentenced Foote to fifteen years in prison for the aggravated-robbery charge and to ten years in prison for the unlawful-possession-of-a-firearm charge.

Soon after the district court imposed its sentence, Foote filed this appeal.

## DISCUSSION

In his sole issue on appeal, Foote argues that his "detention and search by Austin police officers participating in a proactive effort to suppress a spike in crime in Austin's entertainment district were not shown to be justified by a reasonable suspicion of criminality and, therefore, it was error for the trial court to deny his motion to suppress." Stated differently, Foote contends that the testimony of the officers during the suppression hearing reveals that "the information they had was not sufficient to give rise to reasonable suspicion to detain Foote for investigation of any possible illegal activity."

"In a motion to suppress hearing, the trial court is the sole trier of fact and judge of the credibility of the witnesses and the weight to be given their testimony." *State v. Ross*, 32 S.W.3d 853, 855 (Tex. Crim. App. 2000). Accordingly, the trial court may "believe or disbelieve all or any part of a witness's testimony, even if that testimony is not controverted." *Id.* When reviewing a trial

3

court's ruling on a motion to suppress, we "should afford almost total deference to a trial court's determination of the historical facts that the record supports especially when the trial court's fact findings are based on an evaluation of credibility and demeanor." *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997). In addition, we review "*de novo* the court's application of the law of search and seizure" to the facts. *Carmouche v. State*, 10 S.W.3d 323, 327 (Tex. Crim. App. 2000). When no findings of fact are filed, "we must view the evidence in the light most favorable to the trial court's ruling and will uphold the ruling on any theory of law applicable to the case." *Ross*, 32 S.W.3d at 856.

Under the law of search and seizure, the reasonable-suspicion standard applies to "brief detentions which fall short of being fullscale searches and seizures." *Woods v. State*, 956 S.W.2d 33, 35 (Tex. Crim. App. 1997).[1] Under this standard, "a police officer can stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot,' even if the officer lacks probable cause." *Id.* (quoting *Terry v. Ohio*, 392 U.S. 1, 88 (1968)); *see also Illinois v. Wardlow*, 528 U.S. 119, 123-24 (2000) (explaining that for reasonable suspicion to be present, officer must be able to state more than hunch or unparticularized suspicion of criminal activity). "[T]he reasonableness of a temporary detention must be examined in terms of the totality of the circumstances and will be justified when the detaining officer has specific articulable facts, which taken together with rational inferences from those facts, lead him to conclude that the person detained actually is, has been, or

---

[1] Both the State and Foote agree that reasonable suspicion is the governing standard in this case.

soon will be engaged in criminal activity." *Woods*, 956 S.W.2d at 38. When determining if there was reasonable suspicion, reviewing courts must bear in mind that although there may be situations in which a person's conduct appears innocent when viewed in a vacuum, that conduct may establish reasonable suspicion when considered under the totality of the circumstances. *Curtis v. State*, 238 S.W.3d 376, 380 (Tex. Crim. App. 2007). The totality of the circumstances includes the police officers' training and experience. *State v. Alderete*, 314 S.W.3d 469, 473 (Tex. App.—El Paso 2010, pet. ref'd). Accordingly, "when innocent facts, meaningless to the untrained, are used by trained law-enforcement officers, those facts, combined with permissible deductions therefrom, may form a legitimate basis for suspicion of criminal activity." *Id.* Other factors that courts may consider include whether the temporary detention occurred in an area known for having higher rates of crime and whether the person stopped is displaying nervous or evasive behavior. *Wardlow*, 528 U.S. at 124. Moreover, although fleeing from the police "is not necessarily indicative of wrongdoing, . . . it is certainly suggestive of such." *Id.* Furthermore, although it is true that an investigative stop is a seizure, *Francis v. State*, 922 S.W.2d 176, 178 (Tex. Crim. App. 1996), an individual is not "seized until he has yielded to a law enforcement officer's show of authority or when officers physically limit his movement," *Johnson v. State*, 912 S.W.2d 227, 234 (Tex. Crim. App. 1995).

During the suppression hearing, the parties and the district court were primarily focused on the events that occurred before Foote ran from the police. When the district court made its ruling, it explained that it found "that the officers did have reasonable suspicion to conduct a detention at the time that he called in the backup cars, and at that time, then, when Foote evaded."

5

Further, the district court explained that the recent increase in criminal activity in the area, the description of the assailants in the area, and the behavior of Foote and his companions provided the officers with reasonable suspicion. Specifically, the trial court stated as follows:

> [T]he metro tactical unit was placed in this area because of a spike in crime. Part of that spike in crime included a description of two to three African-American males wearing dark clothing with bandannas.
>
> And so when the officer pulled up and saw these three gentlemen and he saw one of them actually holding a bandanna, another factor that I think needs to be considered is that defendant Foote was -- had a glove on his hand on a warm October night in Austin, Texas in this high crime area at precisely the time when the crimes were being committed.
>
> And I think that the testimony was clear that both defendants had on black shirts, black jeans, were dressed entirely in dark clothing. That combined with the furtive movements and basically with the sergeant's knowledge of 17 years on the force of viewing individuals, as he pulled up, he testified that they weren't acting like other individuals going to and from the 6th Street area.

Similarly, in challenging the district court's ruling on appeal, Foote primarily focuses on the activities that Sergeant Dixon observed prior to the arrival of the uniformed officers and on the information that the police had been given regarding criminal activities in the area. For example, he alleges that his presence in the area should not have been suspicious because no one observed him engage in any criminal activity, because there was a lot of foot traffic in the area where he was detained, and because people often parked there to take advantage of free parking. Although Foote acknowledges that the police had been given descriptions of individuals involved in criminal activity in the general area, he asserts that the descriptions were vague, that they provided no information about specific criminal activities or when and where they occurred, and that the crimes referenced

6

in the descriptions had no bearing on his arrest because they referred to crimes that occurred several weeks prior to Foote's arrest. Furthermore, Foote argues that the descriptions given to the police described the suspects as wearing bandannas to cover their faces but that neither Foote nor his companions were wearing bandannas in the manner described. In addition, Foote argues that although Sergeant Dixon testified that he observed Foote perform a furtive gesture and thought that it was strange that Foote and the other two men were just standing at the corner, Foote insists that he and his companions may have exhibited the allegedly suspicious behavior in response to observing Sergeant Dixon's car drive slowly past them while Dixon stared at them. Stated differently, Foote argues that the behaviors that he and his companions exhibited were reasonable and cautionary responses.

However, as noted by the district court, regardless of the events that occurred prior to the arrival of the uniformed officers, Foote's behavior after the arrival of the officers provided the articulable facts necessary to support a reasonable-suspicion determination. In his testimony, Sergeant Dixon explained that after observing Foote and the other men, he called for assistance and that two marked police vehicles quickly responded to the request. Further, Sergeant Dixon related that after the police officers arrived and got our of their vehicles, Foote ran away from the officers. In addition, Sergeant Dixon explained that the officers pursued and caught Foote and "found a weapon that he pitched on the side of the building."

During the hearing, Officer Paul Chavez was also called to the stand. In his testimony, he explained that he responded to the request for assistance made by Sergeant Dixon in less than a minute after receiving the call and saw Foote and two other men standing on a nearby corner.

Then, Officer Chavez related that after he got out of his car, Foote turned his back to the officers and started walking away. Later, Officer Chavez related that the three men were walking prior to the arrival of the officers, but Officer Chavez also explained that another officer asked Foote to stop but that Foote instead started running. Moreover, Officer Chavez testified that he chased Foote and saw "him reach in his waistband and toss what I thought was a gun over the railing." Finally, Officer Chavez also related that he later searched the area where he saw Foote throw the object and found a handgun.

After Officer Chavez testified, Officer Leif Guevara was called to the stand and explained that he responded to Sergeant Dixon's request for assistance and saw Foote "evading on foot from Officer Chavez."[2]

In light of this testimony, we cannot conclude that the district court erred by finding that there was reasonable suspicion to detain Foote. Although it is not clear from Officer Chavez's testimony whether Foote and his companions had started walking before the uniformed officers exited their vehicles, Officer Chavez did testify that Foote began running after an officer asked him to stop and that while he was running away, Foote removed what appeared to be a gun from inside

---

[2] In his brief, Foote contends that his decision to run from the police and to remove an item resembling a gun from his waistband and to toss it could not have provided the officers with reasonable suspicion to detain him because an officer told him to stop just before he started running. For that reason, he argues that the officer had detained him by the time that he started running. We disagree. Given that Foote fled after the officer asked him to stop and continued running until the officers caught up, we cannot agree that Foote was detained when one of the officers asked him to stop because he had not yielded to the officers' show of authority and because the officers were not physically limiting his movements. *See Johnson v. State*, 912 S.W.2d 227, 234, 235 (Tex. Crim. App. 1995) (explaining that show of authority without application of physical force that defendant does not submit to is not seizure and holding that if fleeing defendant does not yield to show of authority, he is not seized until physically stopped or restrained).

8

his pants and then threw the object over a nearby railing. In addition, all three officers testified that they saw Foote running from the police. Foote's decision to run from the police coupled with his reaching into his waistband and throwing what one officer believed to be a gun over a railing after starting to flee provided the officers with "specific articulable facts, which taken together with rational inferences from those facts," led them to conclude that Foote was, had been, or soon would "be engaged in criminal activity." *See Woods*, 956 S.W.2d at 38; *see also Wardlow*, 528 U.S. at 124-25 (concluding that "unprovoked flight upon noticing the police" provided officers with reasonable suspicion).

Although we believe that Foote's behavior after the arrival of the uniformed officers provided them with reasonable suspicion, we note that additional testimony was given during the suppression hearing that supported the district court's determination. In particular, testimony was introduced showing that there had been an increase in criminal activity in the area, that the officers' interaction with Foote occurred late at night, and that Foote and his companions generally met the description for the suspects involved in other crimes in the area: they were African American men wearing dark clothing, and Foote was carrying a bandanna. Moreover, in light of the recent reports of criminal activities in the area by individuals matching the same general description, the officers could reasonably have inferred that the suspects involved in the prior crimes might still be committing crimes in the same area.[3]

---

[3] In his brief, Foote refers to various cases in which courts have held that evidence should be suppressed because there was an insufficient basis to establish reasonable suspicion. However, none of those cases involved the same type of testimony demonstrating multiple articulable facts upon which a reasonable-suspicion determination may be made. *See, e.g.*, *Ceniceros v. State*, 551 S.W.2d 50, 55 (Tex. Crim. App. 1977) (op. on reh'g) (determining that reasonable suspicion did not

For all these reasons, we conclude that when viewed under the totality of the circumstances, Foote's detention was supported by reasonable suspicion and, therefore, overrule Foote's sole issue on appeal.

## CONCLUSION

Having overruled Foote's sole issue on appeal, we affirm the judgments of the district court.

---

exist when facts prompting investigation "were (1) a number of recent burglaries in the area and (2) four men standing together on a sidewalk at an intersection at 10:20 in the morning"); *Scott v. State*, 549 S.W.2d 170, 172-73 (Tex. Crim. App. 1976) (concluding that detention was improper when it was based only on (1) officer's awareness "that there were reports of hubcap thefts in the nearby apartment complex; (2) his characterization of the Towngate area as a 'high crime area'; (3) his observation of two black males driving a white and blue 1974 Cadillac on a dark, sparsely traveled street at 1:30 a.m.; and (4) his observation of the 'sheeting material' in the back seat of the car"); *Gamble v. State*, 8 S.W.3d 452, 452, 453-54 (Tex. App.—Houston [1st Dist.] 1999, no pet.) (determining that detention was not supported by reasonable suspicion where "sole bases for detention were (1) the area had a history of drug sales; (2) the police had had frequent calls to the area or the residence over the last year; (3) it was 3:00 a.m.; (4) appellant was either standing in the street near, or walking in the street toward, a residence to which the officers had been called in past, but at which they had never made arrests for drugs or weapons; and (5) appellant watched the marked police car and walked away from it when it turned around"); *Cook v. State*, 1 S.W.3d 718, 721 (Tex. App.—El Paso 1999, pet. ref'd) (holding that investigatory detention was illegal where officer was unable to see what object was in appellant's hand and had no prior report regarding drug dealing on that day by someone who looked like appellant); *Shelby v. State*, 888 S.W.2d 231, 234 (Tex. App.—Houston [1st Dist.] 1994, pet. ref'd) (holding that reasonable suspicion did not exist when information officer had was that "(1) appellant and [a] juvenile were walking side by side down a road in a high crime area early in the morning; (2) appellant and the juvenile separated after seeing Officer Jackson's marked patrol car; and (3) a substance appearing to be crack cocaine was discovered on the juvenile pursuant to a valid search"); *Gilliam v State*, 832 S.W.2d 119, 121, 122-23 (Tex. App.—Houston [14th Dist.] 1992, no pet.) (upholding suppression of evidence because detention was based on facts that truck was parked at convenience store that had closed for night, that the truck's door was open, and that Gilliam walked to truck and drove off; Gilliam did not drive off a quick rate of speed, and officers had no knowledge of any other crimes occurring in area around store).

_____

David Puryear, Justice

Before Justices Puryear, Rose, and Goodwin

Affirmed

Filed:   August 9, 2012

Do Not Publish

11